## SCHACHT *v.* UNITED STATES

No. 628.   Argued March 31, 1970—Decided May 25, 1970

*David H. Berg* argued the cause for petitioner, *pro hac vice.* With him on the brief was *Chris Dixie.*

*Solicitor General Griswold* argued the cause for the United States.   With him on the brief were *Assistant Attorney General Wilson, Joseph J. Connolly, Beatrice Rosenberg,* and *Sidney M. Glazer.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The petitioner, Daniel Jay Schacht, was indicted in a United States District Court for violating 18 U. S. C. § 702, which makes it a crime for any person "without authority [to wear] the uniform or a distinctive part thereof . . . of any of the armed forces of the United States . . . ." [1] He was tried and convicted by a jury, and on February 29, 1968, he was sentenced to pay a fine of $250 and to serve a six-month prison term, the maximum sentence allowable under 18 U. S. C. § 702. There is no doubt that Schacht did wear distinctive parts of the uniform of the United States Army [2] and that he was not a member of the Armed Forces. He has defended his conduct since the beginning, however, on the ground that he was authorized to wear the uniform by an Act of Congress, 10 U. S. C. § 772 (f), which provides as follows:

> "When wearing by persons not on active duty authorized.
>
> .        .        .        .        .
>
> "(f) While portraying a member of the Army, Navy, Air Force, or Marine Corps, an actor in a

---

[1] Title 18 U. S. C. § 702 provides as follows:

"Whoever, in any place within the jurisdiction of the United States or in the Canal Zone, without authority, wears the uniform or a distinctive part thereof or anything similar to a distinctive part of the uniform of any of the armed forces of the United States, Public Health Service or any auxiliary of such, shall be fined not more than $250 or imprisoned not more than six months, or both."

[2] Schacht wore a blouse of the type currently authorized for Army enlisted men with a shoulder patch designating service in Europe. The buttons on his blouse were of the official Army design. On his head Schacht wore an outmoded military hat. Affixed to the hat in an inverted position was the eagle insignia currently worn on the hats of Army officers.

theatrical or motion-picture production may wear the uniform of that armed force *if the portrayal does not tend to discredit that armed force."* (Emphasis added.)

Schacht argued in the trial court and in this Court that he wore the army uniform as an "actor" in a "theatrical production" performed several times between 6:30 and 8:30 a.m. on December 4, 1967, in front of the Armed Forces Induction Center at Houston, Texas. The street skit in which Schacht wore the army uniform as a costume was designed, in his view, to expose the evil of the American presence in Vietnam and was part of a larger, peaceful antiwar demonstration at the induction center that morning. The Court of Appeals' opinion affirming the conviction summarized the facts surrounding the skit as follows:

"The evidence indicates that the demonstration in Houston was part of a nationally coordinated movement which was to take place contemporaneously at several places throughout the country. The appellants and their colleagues prepared a script to be followed at the induction center and they actually rehearsed their roles at least once prior to the appointed day before a student organization called the 'Humanists.'

.          .          .          .          .

"The skit was composed of three people. There was Schacht who was dressed in a uniform and cap. A second person was wearing 'military colored' coveralls. The third person was outfitted in typical Viet Cong apparel. The first two men carried water pistols. One of them would yell, 'Be an able American,' and then they would shoot the Viet Cong with their pistols. The pistols expelled a red liquid which, when it struck the victim, created the impres-

sion that he was bleeding. Once the victim fell down the other two would walk up to him and exclaim, 'My God, this is a pregnant woman.' Without noticeable variation this skit was reenacted several times during the morning of the demonstration." 414 F. 2d 630, 632.

## I

Our previous cases would seem to make it clear that 18 U. S. C. § 702, making it an offense to wear our military uniforms without authority is, standing alone, a valid statute on its face. See, e. g., *United States* v. *O'Brien,* 391 U. S. 367 (1968). But the general prohibition of 18 U. S. C. § 702 cannot always stand alone in view of 10 U. S. C. § 772, which authorizes the wearing of military uniforms under certain conditions and circumstances including the circumstance of an actor portraying a member of the armed services in a "theatrical production." 10 U. S. C. § 772 (f). The Government's argument in this case seems to imply that somehow what these amateur actors did in Houston should not be treated as a "theatrical production" within the meaning of § 772 (f). We are unable to follow such a suggestion. Certainly theatrical productions need not always be performed in buildings or even on a defined area such as a conventional stage. Nor need they be performed by professional actors or be heavily financed or elaborately produced. Since time immemorial, outdoor theatrical performances, often performed by amateurs, have played an important part in the entertainment and the education of the people of the world. Here, the record shows without dispute the preparation and repeated presentation by amateur actors of a short play designed to create in the audience an understanding of and opposition to our participation in the Vietnam war. *Supra,* at 60 and this page. It may be that the performances were crude and

amateurish and perhaps unappealing, but the same thing can be said about many theatrical performances. We cannot believe that when Congress wrote out a special exception for theatrical productions it intended to protect only a narrow and limited category of professionally produced plays.[3] Of course, we need not decide here all the questions concerning what is and what is not within the scope of § 772 (f). We need only find, as we emphatically do, that the street skit in which Schacht participated was a "theatrical production" within the meaning of that section.

This brings us to petitioner's complaint that giving force and effect to the last clause of § 772 (f) would impose an unconstitutional restraint on his right of free speech. We agree. This clause on its face simply restricts § 772 (f)'s authorization to those dramatic portrayals that do not "tend to discredit" the military, but, when this restriction is read together with 18 U. S. C. § 702, it becomes clear that Congress has in effect made it a crime for an actor wearing a military uniform to say things during his performance critical of the conduct or

---

[3] The precise language of 10 U. S. C. § 772 (f) derives from the 1956 revision of Titles 10 and 32, which was undertaken for the purpose of combining laws affecting the Armed Forces, eliminating duplicate provisions, and clarifying statutory language. At that time the phrase "actor in a theatrical or motion-picture production" was substituted for the previous phrase "in any playhouse or theater or in moving-picture films while actually engaged in representing therein a military . . . character . . . ." 39 Stat. 216–217. Although the 1956 revision and codification, were not in general intended to make substantive changes, changes were made for the purpose of clarifying and updating language. The shift to the present version of § 772 (f) clearly reflects an intent to move to broader, more flexible language which, for example, would include television as well as other types of theatrical productions wherever presented. H. R. Rep. No. 970, 84th Cong., 1st Sess., 8; Statements of Senators O'Mahoney and Wiley, 102 Cong. Rec. 13944, 13953 (July 23, 1956).

policies of the Armed Forces. An actor, like everyone else in our country, enjoys a constitutional right to freedom of speech, including the right openly to criticize the Government during a dramatic performance. The last clause of § 772 (f) denies this constitutional right to an actor who is wearing a military uniform by making it a crime for him to say things that tend to bring the military into discredit and disrepute. In the present case Schacht was free to participate in any skit at the demonstration that praised the Army, but under the final clause of § 772 (f) he could be convicted of a federal offense if his portrayal attacked the Army instead of praising it. In light of our earlier finding that the skit in which Schacht participated was a "theatrical production" within the meaning of § 772 (f), it follows that his conviction can be sustained only if he can be punished for speaking out against the role of our Army and our country in Vietnam. Clearly punishment for this reason would be an unconstitutional abridgment of freedom of speech. The final clause of § 772 (f), which leaves Americans free to praise the war in Vietnam but can send persons like Schacht to prison for opposing it, cannot survive in a country which has the First Amendment. To preserve the constitutionality of § 772 (f) that final clause must be stricken from the section.

## II

The Government's brief and argument seriously contend that this Court is without jurisdiction to consider and decide the merits of this case on the ground that the petition for certiorari was not timely filed under Rule 22 (2) of the Rules of this Court. This Rule provides that a petition for certiorari to review a court of appeals' judgment in a criminal case "shall be deemed in time when . . . filed with the clerk within thirty days after the entry of such judgment." We cannot accept the

view that this time requirement is jurisdictional and cannot be waived by the Court. Rule 22 (2) contains no language that calls for so harsh an interpretation, and it must be remembered that this rule was not enacted by Congress but was promulgated by this Court under authority of Congress to prescribe rules concerning the time limitations for taking appeals and applying for certiorari in criminal cases. See 18 U. S. C. § 3772; Rule 37, Fed. Rules Crim. Proc. The procedural rules adopted by the Court for the orderly transaction of its business are not jurisdictional and can be relaxed by the Court in the exercise of its discretion when the ends of justice so require. This discretion has been expressly declared in several opinions of the Court. See *Taglianetti* v. *United States,* 394 U. S. 316, n. 1 (1969); *Heflin* v. *United States,* 358 U. S. 415, 418 n. 7 (1959). See also R. Stern & E. Gressman, Supreme Court Practice 242–244 (4th ed. 1969), and the cases cited therein. It is true that the *Taglianetti* and *Heflin* cases dealt with this time question only in footnotes. But this is no reason to disregard their holdings and in fact indicates the Court deemed a footnote adequate treatment to give the issue.

When the petition for certiorari was filed in this case it was accompanied by a motion, supported by affidavits, asking that we grant certiorari despite the fact that the petition was filed 101 days after the appropriate period for filing the petition had expired. Affidavits filed with the motion, not denied or challenged by the Government, present facts showing that petitioner had acted in good faith and that the delay in filing the petition for certiorari was brought about by circumstances largely beyond his control. Without detailing these circumstances, it is sufficient to note here that after consideration of the motion and affidavits this Court on December 15, 1969, granted the motion, three Justices dissenting. The

decision of this Court waiving the time defect and permitting the untimely filing of the petition was thus made several months ago, and no new facts warranting a reconsideration of that decision have been presented to us.

For the reasons stated in Parts I and II of this opinion, the judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE HARLAN, concurring.

I join Part I of the Court's opinion. With respect to Part II, I agree with the Court's rejection of the Government's "jurisdictional" contention premised on the untimely filing of the petition for certiorari. In my view, however, that contention deserves fuller consideration than has been accorded it in the Court's opinion.

I

The Court's opinion does not fully come to grips with the Solicitor General's position. The Court rejects the argument that untimeliness under Rule 22 (2) should be given jurisdictional effect by stating, in part, that the Rule "contains no language that calls for so harsh an interpretation." In this regard, however, the time limitation found in Rule 22 (2) is no different from those established by statute; [1] neither makes explicit reference to waivers of the limitation. In the absence of language providing for waiver, we have without exception treated the statutory limitations as jurisdictional. [2] The Solicitor General asks why we should not do the same under our Rule. This issue, *i. e.*, why we treat time require-

---

[1] Compare Rule 22 (2) with, *e. g.*, 28 U. S. C. §§ 2101 (b), (c). Both the Rule and this statute provide for limited extensions of time. There was, however, no extension in the case before us.

[2] *E. g.*, *Matton Steamboat Co., Inc.* v. *Murphy*, 319 U. S. 412 (1943); *Department of Banking* v. *Pink*, 317 U. S. 264 (1942); *Citizens Bank* v. *Opperman*, 249 U. S. 448 (1919).

ments under our Rule differently from the requirements imposed by statute, is hardly acknowledged in the Court's opinion. Moreover, although it is true that *Taglianetti* v. *United States,* 394 U. S. 316, n. 1 (1969), and *Heflin* v. *United States,* 358 U. S. 415, 418 n. 7 (1959), held that the Court could waive untimeliness under our Rule, neither opinion explained why this is so. The Solicitor General does not belittle those two cases merely because each dealt with the problem in a footnote, but rather urges that they are inconclusive because neither gave reasons for the conclusion.[3]

## II

My own analysis of the issue presented here begins with an examination of the statutory authority for Rule 22 (2). This is found in what is now 18 U. S. C. § 3772,[4] a provision authorizing this Court to prescribe

---

[3] The Government relies on language in *United States ex rel. Coy* v. *United States,* 316 U. S. 342 (1942), a case not cited by the Court, as support for its claim that the 30-day limit established by rule was "jurisdictional." The issue in that case was which time limit—the 30-day limit imposed by what was then Rule XI or instead the 90-day limit of the general statutory provision—applied to a petition for certiorari for review of a circuit court affirmance of a district court denial of a motion to correct sentence in a criminal case. After noting that the petition was filed more than 30 days after the judgment of the Court of Appeals, the Court said: "If the judgment of the Court of Appeals is one to which Rule XI applies, the petition for certiorari was filed too late and we are without jurisdiction," *id.,* at 344. In disposing of the case, however, the opinion simply stated that the "writ will . . . be dismissed for failure to comply with Rule XI," *id.,* at 346, not for want of jurisdiction. In any event, the Court in *Coy* did not focus on the issue of whether for good cause Rule XI might be waived, thereby removing a time limitation that otherwise might be termed jurisdictional.

[4] 18 U. S. C. § 3772 derives from 47 Stat. 904 (1933) and 48 Stat. 399 (1934). Before these enactments, certiorari in criminal cases was governed by the general three-month time limitation provided by § 8 (a) of the Judiciary Act of February 13, 1925, 43 Stat. 940.

post-verdict rules of practice and procedure in criminal cases. Section 3772 specifically delegates to this Court the power to promulgate rules prescribing "the times for and manner of taking appeals [to the Courts of Appeals] and applying for writs of certiorari . . . ." While the legislative history of this provision evinces a congressional concern over undue delays in the disposition of criminal cases,[5] the broad terms of the statutory language, as well as what was written in the committee reports,[6] convince me that Congress' purpose was to give this Court the freedom to decide what time limits should apply.

Under the unqualified delegation found in § 3772, I have no doubts concerning this Court's authority to promulgate a rule that required certiorari petitions to be filed within 30 days of the judgment below but that expressly provided that this requirement could be waived for good cause shown, in order to avoid unfairness in extraordinary cases. I also think the Court might promulgate a rule that expressly provided that untimeliness could not be waived even for "excusable neglect"—in other words a "jurisdictional rule."[7]

---

[5] See H. R. Rep. No. 2047, 72d Cong., 2d Sess., 2 (1933); S. Rep. No. 257, 73d Cong., 2d Sess., 1 (1934).

[6] See H. R. Rep. No. 2047, *supra*, at 2 ("A statutory code of procedure is not flexible; changes made desirable by experience can not be promptly made. The overwhelming weight of opinion among judges and lawyers is that matters of practice and procedure may better be controlled by rule than by statute.").

[7] See *United States* v. *Robinson*, 361 U. S. 220 (1960), where we held that under the Federal Rules of Criminal Procedure the Court of Appeals could not enlarge the time for filing an appeal even though it has found "excusable neglect." The Court thought, *inter alia*, that time extensions were inconsistent with the express language of Rule 45 (b), and the "deliberate intention" of its drafters.

In that case, the Court decided that the "conflicting considerations" in favor of or against an "excusable-neglect" provision should be "resolved through the rule-making process and not by judicial

Rule 22 (2), as promulgated, contains no express provision allowing for waiver. It is clear from prior decisions that the Court has interpreted the rule to allow for such a waiver, however.[8] So interpreted, I find Rule 22 (2) no less authorized under 18 U. S. C. § 3772 than would be a rule that by its terms provided expressly for the possibility of a waiver.

Nor do I find it at all anomalous that this Court on occasion waives the time limitations imposed by its own Rules and yet treats time requirements imposed by statute as jurisdictional. As a matter of statutory interpretation, the Court has not presumed the right to extend time limits specified in statutes where there is no indication of a congressional purpose to authorize the Court to do so. Because we cannot "waive" congressional enactments, the statutory time limits are treated as jurisdictional. On the other hand, for the time requirement of Rule 22 (2), established under a broad statutory delegation, it is appropriate to apply the "general principle" that " '[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it,' " *American Farm Lines* v. *Black Ball,* 397 U. S. 532, 539 (1970), quoting from *NLRB* v. *Monsanto Chemical Co.,* 205 F. 2d 763, 764 (C. A. 8th Cir. 1953).

## III

Although I therefore conclude that this Court possesses the discretion to waive the time requirements of Rule

---

decision," given the rather clear indications from the language and background of the existing rule that the omission had been deliberate. Although the Government relies heavily on *Robinson* here, neither the language nor the background of Rule 22 (2) indicates a "deliberate intention" to preclude waiver.

[8] See, *e. g., Heflin* v. *United States, supra; Taglianetti* v. *United States, supra.*

22 (2), it must be recognized that such requirements are essential to an orderly appellate process. Consequently, I believe our discretion must be exercised sparingly, and only when an adequate reason exists to excuse noncompliance with our Rules. In the present case, I agree with the Court that petitioner has adequately explained why he failed to meet our time requirements. On this basis I concur in Part II of the Court's opinion.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE STEWART join, concurring in the result.

I agree that Congress cannot constitutionally distinguish between those theatrical performances that do and those that do not "tend to discredit" the military, in authorizing persons not on active duty to wear a uniform. I do not agree, however, with the Court's conclusion that as a matter of law petitioner must be found to have been engaged in a "theatrical production" within the meaning of 10 U. S. C. § 772 (f). That issue, it seems to me, is properly left to the determination of the jury.

The United States has argued that the exception for "theatrical productions" must be limited to performances in a setting equivalent to a playhouse or theater where observers will necessarily be aware that they are watching a make-believe performance. Under this interpretation, the Government suggests, petitioner must be found as a matter of law not to have been engaged in a "theatrical production"; hence, his conviction for unauthorized wearing of the uniform is lawful without regard to the validity of the "tend to discredit" proviso to § 772 (f). The Court, on the other hand, while refusing to assay a definition of the statutory language, flatly declares that under any interpretation, Congress could not possibly have meant to exclude petitioner's "street skit" from the class of "theatrical productions." Neither extreme, in my view, is correct. The critical question

in deciding what is to count as a "theatrical production" ought to be whether or not, considering all the circumstances of the performance, an ordinary observer would have thought he was seeing a fictitious portrayal rather than a piece of reality. And, although the judge's instructions here did not precisely reflect this interpretation, this question seems eminently suited to resolution by the jury.

Under proper instructions, then, a jury could have concluded that no theatrical production was involved, in which case the verdict should be sustained. However, the judge's instructions also permitted conviction on a finding that petitioner was engaged in a theatrical production, but that the production tended to discredit the military. See App. 51–54. Since the general verdict does not disclose which of these findings—only one of which can constitutionally entail conviction—was the actual finding, the conviction must of course be reversed. *Stromberg* v. *California,* 283 U. S. 359 (1931). I thus join the judgment of reversal but find it neither necessary nor correct to hold that petitioner's "theatrics" perforce amounted to a "theatrical production."