BYBEE, Circuit Judge,
dissenting,
with whom N.R. SMITH and WATFORD, Circuit Judges, join:
Xavier Alvarez announced in a public meeting that he was a former Marine and had been awarded the Congressional Medal of Honor. When the United States prosecuted Alvarez for “falsely representing] himself ... verbally” as having received a military decoration or medal, 18 U.S.C. § 704(b) (2011 ed.), the Supreme Court held that his speech was protected by the First Amendment. United States v. Alvarez, — U.S. -, 132 S.Ct. 2537, 2551, 183 L.Ed.2d 574 (2012) (Kennedy, J.) (plurality opinion); id. at 2556 (Breyer, J., concurring in the judgment). Elven Swisher took Alvarez one step better: he not only said he was a decorated soldier, he proved it by wearing his Marine Corps League uniform with five medals — including a Silver Star, a Purple Heart, and the Navy and Marine Corps Commendation Medal with a bronze “V.” Like Alvarez, Swisher was an undeserving claimant; although a veteran, he had not earned a single one of the commendations he wore. As in Alvarez, the United States indicted Swisher under the Stolen Valor Act, but this time it accused him of violating § 704(a), which prohibits “knowingly wearing] ... any decoration or medal authorized by Congress ... except when authorized.” 18 U.S.C. § 704(a) (2002 ed.).
The majority today holds that Swisher’s conduct is a form of speech entitled to the same protection as Alvarez’s actual speech. I beg to differ. The Supreme Court’s decision in Alvarez does not compel the result here. The law has always been able to tell the difference between conduct and speech, even when the conduct may have some communicative value. I respectfully dissent.
I
Alvarez held that false statements are not categorically unprotected by the First Amendment. Alvarez, 132 S.Ct. at 2545-47 (Kennedy, J.) (plurality opinion); id. at 2552-53 (Breyer, J.,- concurring in the judgment). As Justice Breyer explained, the government can have little interest in policing the “white lies” we tell to “provide the sick with comfort, or preserve a child’s innocence,” or false statements made “in technical, philosophical, and scientific contexts, where ... examination of a false *319 statement ... can promote a form of thought that ultimately helps realize the truth.” Id. at 2553 (Breyer, J., concurring in the judgment). But the Court stopped well short of protecting lying generally. As Justice Kennedy reminded us, “there are instances in which the falsity of speech bears upon whether it is protected.” Id. at 2546 (plurality opinion).
The statute at issue here, however, does not police “white lies,” nor does it prohibit lying generally. Instead, it targets a very specific lie that implicates a very specific government interest, an interest which the full court here and the Supreme Court in Alvarez agrees is significant. And importantly, the lie the government wishes to punish cannot be uttered with words; it can only be accomplished by falsely wearing the nation’s medals. Although the Court in Alvarez found that the harm caused by the form of the he regulated by § 704(b) did not outweigh the First Amendment harm, the interests implicated by § 704(a) must be weighed differently from those at issue in Alvarez under § 704(b). The harm to the government’s interest in upholding the military honors system caused by the false wearing of its medals is greater than the harm caused by “bar stool braggadocio.” Alvarez, 132 S.Ct. at 2555 (Breyer, J., concurring in the judgment). Concomitantly, because § 704(a) requires proof of deceptive conduct, any harm to First Amendment interests is less than in Alvarez, and the less restrictive alternatives discussed in Alvarez, less effective.
The majority today ignores these distinctions, and discusses the outcome of this case as though Alvarez renders it a foregone conclusion. But it is not. Alvarez does not clearly compel the result here— indeed, that was the conclusion reached by a panel of our court in United States v. Perelman, 695 F.3d 866, 872-73 (9th Cir. 2012), in which we upheld § 704(a) under the lesser scrutiny applied to conduct regulations laid out in O’Brien-[1] It was also the conclusion reached by the Fourth Circuit, which found that § 704(a) would survive strict scrutiny. United States v. Hamilton, 699 F.3d 356, 371-74 (4th Cir. 2012). While I do not entirely agree with the reasoning in these cases, they demonstrate that the reach — and indeed the holding — of Alvarez is unclear. Alvarez gives uncertain guidance as to how false statements should be analyzed, especially if Justice Breyer’s opinion controls under Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).[2] Justice Breyer, writing for himself and Justice Kagan, applies what he describes as “intermediate scrutiny,” Alvarez, 132 S.Ct. at 2556, although without really explaining why that is the proper test.
Part of the analytical challenge of Alvarez is trying to understand why intermediate scrutiny applies. In Perelman, the panel used the O’Brien test. 695 F.3d at 872. I can’t agree with the Perelman panel on that point because § 704(a) seems to violate at least one prong of O’Brien: The Government’s interest in § 704(a) is not “unrelated to the suppression of free expression.” O’Brien, 391 U.S. at 377, 88 S.Ct. 1673; see also Texas v. Johnson, 491 *320 U.S. 397, 410, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). For that reason, the Fourth Circuit did not apply O’Brien, but ultimately concluded the statute would survive strict scrutiny. Hamilton, 699 F.3d at 371. The anomaly is, as Judge Davis pointed out, that § 704(a) survives strict scrutiny, but would fail O’Brien’s version of intermediate scrutiny. Id. at 377, 88 S.Ct. 1673 (Davis, J., concurring).[3]
Despite this ambiguity, the majority goes out of its way to extend Alvarez where it does not clearly apply. Moreover, the majority fails to consider the consequences of our decision. In addition to creating an unnecessary split with the Fourth Circuit over a statute that is no longer in effect,[4] today’s decision calls into question the validity of numerous other statutes that prohibit, for example: the unauthorized wearing of a military uniform, 18 U.S.C. § 702—which the Supreme Court has noted is “a valid statute on its face,” Schacht v. United States, 398 U.S. 58, 61, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970); the unauthorized use of the name of federal agencies, 18 U.S.C. § 709; or the impersonation of a federal officer, 18 U.S.C. § 912—a statute we upheld in United States v. Tomsha-Miguel, 766 F.3d 1041, 1048-49 (9th Cir.2014), a case in which we relied on Perelman (which we now overturn).[5] In light of this, I see no reason to extend Alvarez to § 704(a), in order to protect deceptive conduct that has no First Amendment value, and which poses greater harm to the government’s significant interest in upholding the military honors system than did the speech covered by § 704(b).
II
The majority concludes that the Supreme Court’s decision in Alvarez dictates the outcome of this case, identifying three factors from Justice Breyer’s concurring opinion in Alvarez, and mechanically applying them to the statute at issue here. Maj. Op. at 314-17. For the reasons I have explained, I agree with the majority that Justice Breyer’s analysis controls and that the relevant factors are: (1) “the seri *321 ousness of the speech-related harm the provision will likely cause”; (2) “the nature and importance of the provision’s countervailing objectives”; and (3) “the extent to which the provision will tend to achieve those objectives, and whether there are other, less restrictive ways of doing so.” Alvarez, 132 S.Ct. at 2551. Yet in applying these factors, the majority fails to account for the crucial differences between § 704(b) and § 704(a) — and indeed, fails to engage in much critical analysis at all. I am going to address each of the factors in turn.
A
In analyzing the speech-related harm caused by § 704(a), the majority concludes that § 704(a) works the same speech-related harm as § 704(b) because it “lacks the limiting features that, in Justice Breyer’s view, justified other statutes and common law doctrines punishing the communication of false statements.” Maj. Op. at 315. I have two points. First, I part ways with the majority’s premise that speech and communicative conduct are the same for First Amendment purposes. In O’Brien, the Supreme Court rejected “the view that an apparently limitless variety of conduct can be labeled ‘speech’ whenever the person engaged in the conduct intends thereby to express an idea.” 391 U.S. at 376, 88 S.Ct. 1673. Here, the majority doesn’t just blur the lines between conduct and speech, it simply erases them: It finds that the “quantum of conduct involved in pinning on a medal ... is not materially different from the quantum of conduct involved in speaking or writing.” Maj. Op. at 316. With all respect, that just isn’t true. If it were, then we could save ourselves trouble and money by simply announcing that we are awarding medals without actually giving the recipients anything. But as anyone knows who has witnessed the President awarding the Congressional Medal of Honor or a promotion ceremony pinning a new officer — or even an Olympic medals ceremony or a Cub Scout court of honor — there is value, both symbolic and tactile, in the awarding of a physical emblem. If there is important value in the act of awarding a physical medal, there is important value in the wearing of it.[6]
Second, even if there isn’t a relevant difference in content between the lie represented by saying one has a medal and the deceit communicated by actually wearing it, the majority never grapples with the speech-related harms that Justice Breyer focused on in striking down § 704(b), and therefore fails to consider whether there is any difference between the two situations that alters the need for the “limiting features” discussed in Alvarez. For example, *322 Justice Breyer was particularly concerned with the potential chilling effect of § 704(b), because individuals would worry about “being prosecuted for a careless false statement” even if they lacked the requisite mens rea, and so would curtail their own speech. Alvarez, 132 S.Ct. at 2555. It makes little sense, however, to extend this principle — that people sometimes thoughtlessly say things that they don’t really mean — to the context of § 704(a). Here, by contrast, it seems unlikely that' an individual could carelessly or negligently wear a military medal with the intent to deceive. Thus, there is less danger here that individuals will self-censor their sartorial choices for fear of being prosecuted for negligent speech.[7]
There is also much less ambiguity in the .wearing of a military medal, and that diminishes the risk of selective prosecution under this provision. Id. at 2555 (Breyer, J., concurring in the judgment) (noting the risk that § 704(b) may be applied “subtly but selectively to speakers that the Government does not like,” particularly in the political arena). Human speech is often ambiguous and subject to different interpretations. As a result, speech subject to § 704(b) must be understood in context, and thus is more easily subject to manipulation and “the risk of censorious selectivity by prosecutors.” Id. As judges, we are familiar with the dangers of reading a cold record and trying to supply voice inflection, facial expression, and body language.[8] For good reason, we defer to the fact-finders who have actually seen the witnesses to judge their demeanor as a measure of their truthfulness. See e.g., Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (“[Ojnly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding of and belief in what is said.”); United States v. Raddatz, 447 U.S. 667, 679, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (“ ‘The most careful note must often fail to convey the evidence fully in some of its most important elements.... It cannot give the look or manner of the witness: his hesitations, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration.’ ” (quoting Queen v. Bertrand, 16 Eng. Rep. 391, 399 (1867))).
By contrast, wearing clothing, particularly with the precision demanded when one dons a military uniform, is far less ambiguous than the vagaries of human speech. The very nature of a uniform suggests that once we recognize the distinctive colors and insignia, we know immediately whether we are dealing with the *323 local constabulary or a member of the nation’s armed forces, whether the service member is wearing the camouflage of the ground forces or the crisp whites of the navy, whether the service member belongs to the armored division or the medical corps, and whether the member is commissioned or non-commissioned. In the same vein, we can discern, without any words being exchanged, the campaigns in which the member has participated and whether the member has been decorated for actions in combat. Indeed, so clear is our understanding of the meaning of the uniform that no voice inflection or body language can countermand what we have seen for ourselves. Elven Swisher didn’t have to tell anyone that his Purple Heart meant that he had been wounded in battle, or that his Navy and Marine Corps Commendation Medal was awarded for valor.
Contrary to the majority’s assertion that there is no principled distinction between § 704(a) and § 704(b), Maj. Op. at 316, § 704(a) engenders less potential constitutional harm than § 704(b), because there is less risk to the First Amendment in the government identifying and policing specific instances of deceptive conduct than in trying to police the line between false and true statements.
B
The false wearing of military medals poses significantly greater harm to the government’s interests than does mere false speech. That means that, contrary to the majority’s assertion, Maj. Op. at 317, the government’s objectives here are not precisely the same as those at issue under § 704(b). The United States has a powerful interest in protecting the integrity of its military decorations. Indeed, Congress has punished the wearing, manufacture, or sale of military decorations without authorization since 1923. See Act of Feb. 24, 1923, ch. 110, 42 Stat. 1286. The wearing of an unearned military medal dilutes the message conveyed by the medal itself. Even if the wearer is later exposed as a liar, the utility of the medal as a symbol of government commendation has been undermined. The public can no longer trust that the medal actually is a symbol of government commendation, i.e., that the person wearing the medal has actually earned it. This results in a different, more concrete harm than that which may arise from the false statement that one has earned a military medal. It is one thing to say that one has been decorated; it is quite another to produce the evidence for it by appropriating a symbol that the government, through decades of effort, has imbued with a particular message. Unlike false statements, which may work harm by giving the public the general impression that more personnel earn military honors than actually do, the false wearing of medals directly undermines the government’s ability to mark out specific worthy individuals, because the symbol the government uses to convey this message can no longer be trusted. This may also mean that those who rightfully wear a military medal are less likely to be believed.
In this respect, a military medal is akin to a trademark: a symbol that denotes a particular level of quality, or worthiness. See Alvarez, 132 S.Ct. at 2554 (Breyer, J., concurring in the judgment) (“Statutes prohibiting trademark infringement present, perhaps, the closest analogy to the present statute.”). As Justice Breyer recognized in Alvarez, a false claim regarding a military medal “creates confusion about who is entitled to wear it, thus diluting its value to those who have earned it, to their families,, and to their country.” Id. Although in Alvarez, Justice Breyer ultimately concluded that the confusion caused by false statements was not suffi- *324 dent to outweigh the constitutional harm caused by the statute, here, the calculus is different, because § 704(a) creates less risk of constitutional harm, and because the wearing of an unearned medal offers more convincing proof of the lie than .a mere false statement.
The false and deceptive wearing of military medals “dilutes the value” of military honors generally, by conveying the impression that “everyone” earns them. Moreover, such conduct also dilutes the symbolic value of the medal itself, hampering the government’s ability to reward those it has concluded are worthy of recognition. The purpose of a military medal is not only that it conveys the government’s appreciation for an individual’s service to the individual, but that it conveys the government’s commendation of that individual to others, identifying the medal winner “as an example worthy of emulation.” United States v. Alvarez, 617 F.3d 1198, 1234 (9th Cir.2010) (Bybee, J., dissenting). The value of the military medal, like the value of a trademark, is that it is both recognizable and publicly understood to convey a specific message: in this case, the message that the wearer has done something worthy of admiration. When those who are unworthy are allowed to wear the medal, the government can no longer identify its heroes in a way that is easily discernible by the public.
To be clear, this harm does not occur when an unearned medal is worn for purposes of art, theater, political expression, or the like. It is only when the medal— wearer wears the medal in order to appropriate the message conveyed by the medal — that the wearer has actually earned a military honor — that the medal’s symbolic value is diluted. Elven Swisher, however, was not wearing his false military medals for purposes of art, political expression, intellectual debate, or even any of the “innocent” reasons people may lie. He wore his medals to support the elaborate story he had concocted to fraudulently obtain disability benefits from the government. He even wore his fraudulent medals to embellish his credibility when testifying at a criminal trial (not his own). See United States v. Hinkson, 585 F.3d 1247 (9th Cir. 2009) (en banc), as amended, 611 F.3d 1098 (9th Cir.2010).[9] It is absurd to argue that allowing someone like Swisher to wear unearned military honors in the course of impersonating a war hero does not do significant damage to the value of the genuine honor bestowed on those who have sacrificed for their country.
C
Finally, there are fewer less restrictive regulatory alternatives available to the government where the unauthorized and deceptive wearing of a military medal is *325 concerned. To be sure, the statutory provision at issue here punishes the same kind of lie at issue in Alvarez. But the fact that the lie here is told in a more effective way, with physical proof in the form of the medal to support the false claim of entitlement, increases the harm caused by the lie and also means that other, less restrictive means are less likely to be effective. Justice Breyer noted that many statutes punishing false statements require some showing of actual or likely harm resulting from the lie and suggested that “a more finely tailored statute might ... insist upon a showing that the false statement caused specific harm or at least was material, or focus its coverage on lies most likely to be harmful or on contexts where such lies are most likely to cause harm.” Alvarez, 132 S.Ct. at 2556 (Breyer, J., concurring in the judgment). Section 704(a) satisfies Justice Breyer’s concerns. First, the harm caused by the false wearing of military medals is material. It is material to the message conveyed by the medals themselves. When pretenders wear medals, the medal itself can no longer be taken as a sign that the wearer has earned it and is therefore worthy of commendation. Second, § 704(a) is confined to a single context— the intentional wearing of medals when the wearer intends to deceive — where it is most likely to cause harm.
Moreover, “counterspeech” will be less effective in correcting the falsehood conveyed by deceptively wearing an unearned military decoration. See Alvarez, 132 S.Ct. at 2549-50 (Kennedy, J.) (plurality opinion); id. at 2556 (Breyer, J., concurring in the judgment). One could denounce Swisher as an impostor, but as the Fourth Circuit explained, “speech may not effectively counter that which a person sees.” Hamilton, 699 F.3d at 373. One could, perhaps, engage in a war of words with Alvarez, but Swisher, who has the medals on his uniform, occupies the high ground.
Finally, the majority, following Alvarez, 132 S.Ct. at 2550-51 (Kennedy, J.) (plurality opinion); id. at 2556 (Breyer, J., concurring in the judgment), proposes a database of medal winners as a means to counteract Swisher’s deception.[10] Maj. Op. at 317. To my mind, this is no solution at all to the problem of individuals falsely wearing medals. If the public has to check the database to confirm that a medal wearer actually earned the medal, the purpose of the medal itself is utterly defeated. If we can no longer trust what we can see, the only honor the United States can confer on its heroes is a listing in a database. Once wearing the medal itself doesn’t signify anything more than a presumption of a property right, the nation’s highest honors will have become, literally, virtual.
Ill
I would uphold the constitutionality of § 704(a). I respectfully dissent.

. United States v. O’Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

. Justice Kennedy, writing for himself and three others, applies strict scrutiny to § 704(b)'s “content-based restrictions.” Alvarez, 132 S.Ct. at 2548 (Kennedy, J.) (plurality). In dissent, Justice Alito, joined by two others, would have held that Alvarez’s false statement "merit[ed] no First Amendment protection.” Id. at 2563 (Alito, J., dissenting). Justice Breyer’s opinion is the narrowest opinion that a majority of the Court agreed upon. Marks, 430 U.S. at 193, 97 S.Ct. 990.

. In my view, § 704(a) should be reviewed under intermediate scrutiny and treated as an "impersonation of a war hero” statute. See Alvarez, 132 S.Ct. at 2554 (Breyer, J., concurring in the judgment) (noting that § 704(b) differs from anti-impersonation statutes because they typically prohibit "acts of impersonation, not mere speech”); see also id. at 2553-55 (discussing examples of the "many statutes and common-law doctrines [that] make the utterance of certain kinds of false statements unlawful”). Unlike § 704(b), we deal here with something more than "mere speech.”

. ” Both provisions of the Stolen Valor Act were amended following Alvarez, subsequent to the events that gave rise to Swisher’s case. Congress removed the “wearing” provision in § 704(a), apparently preemptively, and more substantively revised § 704(b) to comply with the Court’s holding in Alvarez. See Stolen Valor Act of 2013, Pub.L. No. 113-12, § 2, 127 Stat. 448 (2013). Thus, the precise provisions at issue here are no longer in effect. As amended, however, the statute would still appear to cover Swisher’s conduct. Section 704(b) now reads: "Whoever, with intent to obtain money, property, or other tangible benefit, fraudulently holds oneself out to be a recipient of a decoration or medal ... shall be fined under this title, imprisoned not more than one year, or both.” 127 Stat. 448.

.Consider also: 18 U.S.C. § 703 (unauthorized wearing of a uniform of a friendly nation); § 706 (wearing of Red Cross with the fraudulent purpose of inducing the belief that wearer is a member or agent of the Red Cross); and § 706a (wearing of Geneva distinctive emblem (Red Crescent or Red Crystal) with fraudulent purpose of inducing the belief that wearer is a member or agent of an authorized national society using the emblem, the International Committee of the Red Cross) or the International Federation of Red Cross and Red Crescent Societies).

. The majority notes, twice, that distinguishing between pure speech, like false statements, and "symbolic speech" conveyed through conduct, like the unauthorized wearing of a military medal, is inconsistent with Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). Maj. Op. at 311 n. 6, 317 n. 12. This reference to Johnson is puzzling. Johnson is relevant only if we must analyze this statute under strict scrutiny as a content-based restriction on speech. See Johnson, 491 U.S. at 411-12, 109 S.Ct. 2533 (applying strict scrutiny to a statute prohibiting the burning of the American flag). But Justice Breyer’s concurrence in Alvarez, on which the majority bases its entire analysis, clearly departs from this traditional First Amendment framework, analyzing restrictions on false speech under an intermediate scrutiny, balancing-of-interests approach Justice Breyer refers to as "proportionality.” Alvarez, 132 S.Ct. at 2551-52 (Breyer, J., concurring in the judgment). Mpreover, as I have already noted, in analyzing false speech, Justice Breyer specifically distinguishes between “mere speech” and “acts of impersonation where an act of impersonation is more likely to cause harm.” Id. at 2554 (emphasis in original). Johnson is irrelevant here.

. For reasons the panel explained in Perelman, because we must read § 704(a) to prohibit only the wearing of a medal with the intent to deceive, the statute does not apply to anyone wearing a medal in a theatrical production, as part of a Halloween costume, or in protest as a political statement. 695 F.3d at 870 (listing these and other examples). In these situations, we will readily recognize that the wearer is making no claim to being a medal recipient. The only person who can be prosecuted under § 704(a) is one who is lying and wants us to rely on his possession of the medal as proof of his valor. There is no First Amendment value in that lie.

. Consider, for example, Charlie Chaplin’s classic exchange in The Great Dictator (1940). When Chaplin mutters "this is a fine country to live in,” he is arrested, but escapes punishment by explaining that all he said was "this is a fine country to live in.” Joseph G. Brennan, A Handbook of Logic 213 (2d ed.1961) (describing this an example of the informal "fallacy of accent”). See also Watts v. United States, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (overturning the petitioner’s conviction for threatening the President because his statement, made at a political rally opposing the Vietnam war, was simply "crude” "political hyperbole,” not a true threat).

. Swisher testified as a government witness in a federal murder-for-hire case, appearing on the witness stand with a Purple Heart pinned to his lapel. Hinkson, 585 F.3d at 1254. Swisher testified that the defendant in that case, David Hinkson, had heard about his impressive military service record and had wanted to hire him to torture and kill a federal judge, an AUSA, and an IRS agent. During the course of the trial, Hinkson’s lawyers called Swisher’s credibility into serious question, on the basis that his "reissued” military discharge papers, which detailed the military honors Swisher had supposedly won, could not be authenticated. See id. at 1251-57 (recapping the Hinkson trial and Swisher's role); see also United States v. Hinkson, 611 F.3d 1098 (9th Cir.2010) (en banc) (amending the original en banc opinion); id. at 1099 (W. Fletcher, J., dissenting) (discussing in even more detail Swisher’s relationship with Hink-son and the Hinkson trial). The parties here agreed that Swisher’s conduct at the Hinkson trial would not be introduced at his own trial. Swisher was indicted based on a photograph showing that he had worn his false medals to a Marine Corps League event.

. The majority, quoting Alvarez, refers to the database as an " 'information-disseminating device’ ” for confirming that the medal wearer has actually earned the military honor. Maj. Op. at 317 (quoting Alvarez, 132 S.Ct. at 2556 (Breyer, J., concurring in the judgment)). Although it is low-tech, we already have such an “information-disseminating device:” the medal.